

**MANAGEMENT SERVICES AGREEMENT**
**SELECT LABORATORY PARTNERS ("SLP") AND**
**NEW LABORATORY COMPANY ("THE COMPANY")**

This MANAGEMENT SERVICES AGREEMENT ("Agreement") is made and entered into to be effective as of 5-8-2012 ("Effective Date") by and between RAJ Enterprises of Central Florida ("The Company") located in Ocala, Florida and Select Laboratory Partners ("SLP") of Greensboro North Carolina.

**RECITALS**

WHEREAS; The Company will operate a Drug Screening and Confirmation Laboratory in or near Ocala Florida, which will specialize in the treatment and management of patients who suffer with chronic pain and;

WHEREAS; The Company desires to operate its own High Complexity CLIA laboratory testing facility; providing drug testing, as more fully set forth in Exhibit A (the "Diagnostic Lab") and;

WHEREAS; SLP is a company that specializes in the development and management support of diagnostic laboratories and also sells and provides a variety of laboratory testing equipment, information systems, reagents, diagnostic products and services and;

NOW, THEREFORE; for and in consideration of the mutual promises of the parties hereto, and of the covenants and conditions hereinafter expressed, the parties hereby agree and covenant, each with the other, as follows:

1. **RESPONSIBILITIES OF SLP.**

SLP shall provide the following clinical and administrative services (the "Services") to manage and facilitate the operations of the Diagnostic Lab.

   1.1 Under this Agreement SLP will serve as The Company's sole and exclusive manager of certain technical services in connection with the operation of its Diagnostic Lab, as set forth below. SLP shall oversee, administer, and coordinate the day-to-day technical operations taking place in the Diagnostic Lab.

1.2 SLP will provide Laboratory Director personnel, a qualified Florida and CLIA director and doctorate level toxicology specialist and a CLIA specialist to support the Diagnostic Lab. The Laboratory Director will meet the standards and qualifications set forth by CLIA for a High Complexity Laboratory. Such individual will work in concert with The Company for the required oversight of such a High Complexity Laboratory.

1.3 SLP shall assist in the recruitments of the Senior Scientist and the General Supervisor / Lab Manager acceptable to The Company who are (i) qualified and licensed, as required by law to provide these services.

1.4 SLP shall share in the responsibility for the hiring and training of these and future Diagnostic Lab Staff, able to perform testing to the required standards. The Company and SLP shall be responsible for determining the salaries.

1.5 SLP shall support the Company in the selection of most laboratory equipment other than the LCMS and related supplies necessary to provide the Services hereunder. SLP shall maintain all laboratory equipment that SLP supplied in good repair, condition and working order in accordance with manufacturer specifications, preventive maintenance and safety guidelines. In performing its equipment maintenance obligations under this Section, the parties understand and agree that SLP is permitted to provide such services directly or contract with the medical device manufacturer or a qualified medical device service provider. The Company will be responsible for the purchase or lease, maintenance, minor equipment and supplies pertaining to the LCMS instruments and related testing.

1.6 Medical Record Documentation. SLP and The Company shall require that all lab Support Personnel record, maintain, and complete, accurate records or clinical notes reflecting the provision of services furnished in the Diagnostic Lab under this Agreement including any forms and medical necessity documents required by Medicare or any other third-party payer.

1.7 SLP shall strive to ensure its employees and agents providing services under this Agreement comply with any applicable standards of the Clinical Lab Improvement Amendment ("CLIA") on the accreditation and licensing of the Diagnostic Lab as a CLIA High Complexity Laboratory applicable to the Medicare Conditions of Participation, and all policies and procedures of the Lab.

1.8 SLP and The Company shall maintain and keep current all written policies and procedures for the Diagnostic Lab, including without limitation, policies and procedures regarding quality assurance, test procedure manuals, incident reporting; complaint reporting and records retention. This will be done under SLP direction.

2

1.9     General Limitation on SLP's Services.

1.9.1  SLP is hereby expressly authorized to subcontract with other persons       or
        entities for any of the services SLP is required to perform under this
        Agreement.

1.10   Nondiscrimination. SLP employees and agents shall provide Services to The
        Company's patients without discrimination on the basis of source of
        payment, gender, race, color, age, religion, national origin, mental or
        physical disability, or any other grounds prohibited by law.

## 2   RESPONSIBILITIES OF THE COMPANY.

2.1    The Company shall own the Diagnostic Lab and take full responsibility for
        all business aspects thereof including general liability, professional liability
        and billing for all services provided. SLP, its Directors and employees will be
        covered under this insurance coverage.

2.2    The Company will be solely responsible for all sales and marketing.

2.3    The Company shall be responsible for supplies, and maintenance not
        involving instruments and equipment specifically supplied by SLP.

2.4    The Company will also be responsible for travel and reasonable expenses
        incurred that relate to the business of The Company.

2.5    The Company will be solely responsible for all matters and responsibilities
        pertaining to sales, billing, pricing, collections and non-technical customer
        relations

2.6    The Company will be responsible for the selection and purchase of a
        Laboratory Information System that will meet all of The Company's
        requirements. This will be done with SLP support based on SLP's
        experience.

2.7    Supervision and Administration Oversight.

2.7.1  SLP and The Company shall share final responsibility for all
        technical decisions that affect the operations of the Diagnostic Lab.

2.7.2  The Company shall be responsible for the appointment of a
        Medical Director, if required, who will be a physician and will
        work with the SLP Laboratory Director, when needed in
        monitoring the quality of Services furnished at the Diagnostic Lab
        under this Agreement. The Laboratory Director shall be provided
        to The Company by SLP and shall be qualified as a Laboratory
        Director of a CLIA High Complexity Lab.  The cost of the

3

Laboratory Director's services will be paid to SLP on a monthly basis.

  2.7.3  The Company will hire and appoint a general manager to direct all non-technical operations. All staff will be the responsibility of The Company.. All technical operations will be overseen by SLP. The Lab Manager and Senior Scientist will be requried by the Company to report to and accept guidance from SLP designated senior managers.

2.8  <u>Access to Records</u>.  The Company shall permit access by SLP to Patient laboratory records relating to the provision of Services by SLP, subject to federal and state confidentiality laws and <u>Section 8</u> below.

2.9  <u>Exclusivity</u>.  The Company agrees that SLP shall have the exclusive right to provide the Services set forth in Section 1 above, during the term of this Agreement.

2.10  <u>Compliance with Law and Accreditation Standards</u>.  The Diagnostic Lab is and shall remain duly accredited and licensed as a High Complexity CLIA Lab throughout the term of this Agreement unless otherwise agreed by the parties. The Company will also be responsible for the cost of High Complexity CLIA licensing, registration and maintaining of licensure for the Diagnostic Lab. The Company agrees to operate in compliance with all federal and state legal requirements including the Stark law and Federal Anti-Kickback law.

## 3  DIAGNOSTIC LAB SPACE

3.1  The Company shall be responsible, at its expense, for furnishing adequate space for the Diagnostic Lab and general items such as cabinets, counter tops, refrigerators, laboratory chairs, free standing tables and other items where deemed necessary, including file cabinets, eye wash station, bookcases, adequate climate control and all utilities including sinks and dedicated electrical circuits and utilities as required.

3.2  SLP will work with The Company's architect or contractor to design and lay out the laboratory space to meet all requirements.

## 4  COMPENSATION.

4.1  <u>Base Compensation</u>.  SLP agrees to accept as payment for the Services furnished under this Agreement the amounts identified in the compensation schedule set forth in <u>Exhibit B,</u> which is incorporated herein by reference.

4.2  <u>Adjustments.</u>  The compensation amounts set forth in this Agreement will be reviewed annually and may be adjusted on the anniversary date of this agreement by mutual written agreement of the parties. Notwithstanding the

4



preceding sentence, in the event The Company desires to add any new Diagnostic Lab procedures, equipment or additional services, The Company hereby agrees to pay the additional cost, as outlined at the time by SLP for said additional services, procedures, supplies, instruments or labor costs.

4.3   Payment.  The amount due to SLP, except for the Advance payment which is due at signing, will be due and payable on or before the tenth (10th) of each month beginning the month following the month when the automated chemistry system or the LC/MS system is delivered.

4.4   Billing.  The Company shall perform all billing for Diagnostic Lab patients, Medicare, Medicaid and other third-party payers. The Company will pay SLP on the basis established in Exhibit B.  All decisions as to tests performed and how they are billed are the responsibility of The Company and its clients and are not the responsibilities of SLP.

4.5   Term.  This Agreement shall remain in full force and effect for an initial term of five (5) years commencing on the Effective Date (the "Initial Term"). After the Initial Term, this Agreement shall automatically renew in one (1) year term increments ("Renewal Term(s)") unless either party gives written notice to the other party at least one hundred eighty (180) days prior to the end of any Initial or Renewal Term.

4.6   Termination.  This Agreement may be terminated sooner on the first of the following to occur:

   4.6.1  Termination by Mutual Consent.   This Agreement may be terminated at any time by the mutual written agreement of the parties with one hundred eighty (180) days written notice.

   4.6.2   Termination for Breach or Other Reason

      4.6.2.1  Breach by Either Party.   In the event either party shall materially fail to comply with the provisions specified in this Agreement (including timely payments for products and services provided), and such breach is not cured within thirty (30) calendar days of the receipt by the party in breach of written notice thereof, then the notifying party shall have the right, in addition to any other rights it may have, to terminate this Agreement immediately. Termination for Breach does not relieve the offending Party of any other responsibility it has under this Agreement.

      4.6.2.2  Termination of Agreement as the Result of Change in Law, Regulation, or Other Requirement.  Either party shall have the right, on written notice to the other party, to propose to amend this Agreement, without liability, if

5

the terms of this Agreement are interpreted to violate any law, regulation, or other requirement applicable to it. The Parties agree to negotiate in good faith to establish new and acceptable terms to appropriately modify the Agreement.

## 5   RELATIONSHIP OF THE PARTIES.

5.1   In the performance of Services under this Agreement, it is mutually understood and agreed that The Company and SLP are, and at all times shall be, independent contractors.

5.2   It is understood and agreed that the onsite lab management personnel are indirect employees of the Diagnostic Lab and are paid for by The Company through SLP and ADP Total Source. The cost to The Company for each employee of the Diagnostic Lab shall be based upon actual salary plus 25%. Costs to The Company shall increase accordingly when annual cost of living wage increases are awarded to the personnel of the Diagnostic Lab.

## 6   CONFIDENTIALITY OF PROPRIETARY INFORMATION.

Except as required by law, each party, during the term of this Agreement and following termination of this Agreement, shall strictly maintain the confidentiality of any proprietary information including, but not limited to, trade secrets of the other party. All information which the parties have a reasonable basis to consider proprietary information, or which is reasonably treated by any party as being proprietary, shall be presumed to be proprietary. Each party shall take necessary and reasonable precautions to prevent unauthorized disclosure of proprietary information or patient medical information and shall require all of its officers, employees and other personnel to whom it is necessary to disclose the same, or to whom the same has been disclosed, to keep such proprietary information confidential. Upon termination of this Agreement, each party agrees to return to the other all proprietary information of the other party in such party's possession including, without limitation, any documentation evidencing The Company's or SLP's policies, procedures, clinical protocols, and all intellectual property related to the performance of laboratory testing and the operation of the Diagnostic Lab.

## 7   PRIVACY OF HEALTH INFORMATION, BUSINESS ASSOCIATE PROVISIONS.

7.1   In the performance of Services called for by this Agreement, The Company and SLP may be required to share or disclose to each other and/or SLP may come into possession of certain business, financial or clinical information that may be protected by federal, state and local laws and regulations regarding the privacy, security and/or privilege of medical/health information, including federal privacy and security regulations promulgated under HIPAA (collectively "Protected Health Information or  PHI"). SLP shall implement appropriate safeguards to prevent the unlawful use or



6

disclosure of PHI, other than as provided for by this Agreement and as set forth herein.

## 8   LIABILITY INSURANCE.

The Company and SLP shall carry professional liability insurance having minimum limits of liability of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate, or as the parties may otherwise mutually agree. The Company shall carry general liability coverage for The Company location including the Laboratory.

GENERAL PROVISIONS

8.1   Notices. Notices or communications to be given under this Agreement shall be given to the respective parties in writing either by personal delivery, overnight delivery service, or registered or certified mail, postage prepaid as follows:

To   :                            **To SLP:**
JIM PORTER                         **CEO**
                                   **Select Laboratory partners, Inc.**
                                   **1100 Revolution Mill Dr.- Suite 1**
                                   **Greensboro, NC 27405**

Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns, and nothing in this Agreement is intended, nor shall be deemed, to confer any benefits on any third party.

8.2   Assignment. No assignment of this Agreement or of the rights and obligations hereunder shall be valid without the prior written consent of the non-assigning party. Subject to the foregoing, this Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, successors, legal representatives and permitted assigns.

8.3   Waiver. Waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any prior, concurrent or subsequent breach. None of the provisions of this Agreement shall be considered waived by either party except when such waiver is given in writing.

8.4   Access to Records. Each party shall keep, and allow the other party reasonable access to, full and accurate books and records of all services rendered hereunder. Further, to the extent required by Section 1395x(v)(1)(I) of Title 42 of the United States Code, until the expiration of four years after the termination of this Agreement, each party shall, upon written request, make available to the Secretary of the United States

Department of Health and Human Services, or to the Comptroller General of the United States General Accounting Office, or to any of their duly authorized representatives, a copy of this Agreement and such books, documents, and records as are necessary to certify the nature and extent of the costs of the services provided under this Agreement.

    8.4.1  <u>Entire Agreement; Amendment</u>.  This Agreement, any amendments or addenda hereto, and any exhibits specifically mentioned herein constitute the entire agreement between the parties and supersede all prior or contemporaneous discussions or agreements. This Agreement may be modified only in writing duly executed by both parties.

8.5 <u>Severability</u>.  If any term or provision of this Agreement is held invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

8.6 <u>Cooperation</u>.  In the event of any litigation against either party pertaining to any matter relating to The Diagnostic Lab under this Agreement, both parties agree to fully cooperate with the other at all times during the pendency of the claim or lawsuit including, without limitation, providing the other with all available information, including medical records (to the extent permitted by applicable law).

8.7 <u>Counterparts.</u> This Agreement may be executed in one or more counterparts each of which may be deemed an original, but all of which constitute one and the same instrument.

8.8 <u>Agreement Subject to State and Federal Law</u>.  The parties recognize that this Agreement at all times is subject to applicable federal, appropriate state and local law. Any provisions of law that invalidate, or otherwise are inconsistent with the terms of this Agreement, or that would cause one or both of the parties to be in violation of the laws, shall be deemed to have superseded the terms of this Agreement; provided however, that the parties shall exercise their best efforts to accommodate the terms and intent of this Agreement to the greatest extent possible consistent with the requirements of applicable laws and regulations.

**IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.**

Select Laboratory Partners

_____     _____
Tim Fonte                3-8-12

_____     Ernest A. Knesel          Date 5/8/12
Date                          WILLIAM WADDINGTON

8

## EXHIBIT A
## LAB/SERVICES

1. The Diagnostic Lab will offer the following tests under the management of SLP;

    1.1 The drug screening tests are Qualitative and Semi-Quantitative in nature, and consist of, but are not limited to; Amphetamine, Methamphetamine Barbiturates, Benzodiazepine, Cannabinoid, Cocaine, Ecstasy, Methadone, Opiates, Oxycodone, Propoxyphene, Phencyclidine. This testing is to be performed using an automated Immunochemistry system by enzyme immune assay method.

    1.2 Confirmatory Drug testing performed will be Quantitative for specific analytes. It will be performed in the laboratory using LC/MSMS instruments procured and maintained separately by The Company. The range of such testing performed will be more extensive and will be determined by The Company.

2. Drug screening tests will be added upon request and upon the availability of reagents required for newly requested drug tests. It is the intention of The Company and SLP to establish testing of both urine and oral fluid samples.

3. Under the terms and conditions of this Agreement the Diagnostic Lab will be licensed by CLIA to perform testing in compliance with current CLIA regulations and will remain licensed as stated in this Agreement.

4. SLP shall make regularly scheduled visits to the laboratory site and be available by phone as needed for compliance with CLIA regulations and for Quality Assurance. The Laboratory or Technical Director and SLP appointed CLIA specialist will also be available, as needed, by phone. SLP will keep The Company management fully informed of all important technical matters relating to lab operation and will be present during scheduled CLIA or other accreditation inspections.

5. SLP will furnish training services to the Onsite General Supervisor/Lab Manager for the operation of the on-site chemistry analyzer.

6. SLP and The Company will cooperate to furnish the Onsite General Supervisor/ Lab Manager and Senior Scientist with appropriate back-up as scheduling allows.



## EXHIBIT B

### MANAGEMENT COMPENSATION
### SCHEDULE AND PLAN

1.  The Company shall pay SLP monthly for SLP's services as follows for the term of this Agreement:

    The Company shall make a monthly payment ("Management Fee") to cover certain projected direct operational and overhead costs for the term of this Agreement. The amount of said Management Fee will be $4,000 per month ($48,000 per year). These payments will begin the month that either the chemistry analyzer or the LC/MSMS are delivered.

    a.  The services of the Laboratory Director who is CLIA qualified to oversee a High Complexity laboratory, required to obtain and maintain the High Complexity CLIA License, will be provided by SLP to The Company at the contracted rate of $1,000 per month, ($12,000 per year). Payment will start the month that either the chemistry analyzer or the LC/MSMS are delivered. Or, the Company can supply a qualified Director at the Company's cost.

    b.  The Company shall be directly responsible for the cost of High Complexity CLIA/State licensing and registration and maintaining of said licensure. The costs involved are on a state by state basis, based upon expected test volumes, and are determined by, and payable directly to, CLIA. The Company shall be responsible for all Medicare, Medicaid and third party insurance payer applications and agreements.

    c.  SLP agrees to sell The Company its IR-500 chemistry analyzers at the discounted price of $35,000 each which will be payable upon delivery of the system. The first year's warranty is included. Service after the first year will be at the rate of $4,900 per year and payable in advance.

    d.  The Company will pay SLP, $1.50 per drug urine and $1.90 per drug oral fluid, per patient tested using a chemistry analyzer, reported and billed, in addition to the Management Fee and other charges, (i.e. 10 urine drugs @ $1.50 each equals a total of $15.00) which will include all SLP furnished reagents, calibrators, controls.(Oral fluids will be charged at $1.50 for the first 6 months of billing). The amount of reagents used will vary with actual patient volume, controls and calibrators run and the occasional need to repeat any testing. SLP will be responsible for such variable costs. The Company will pay SLP $1.50 per urine Creatinine performed, $1.50 per urine alcohol performed, and $1.50 per urine pH performed. SLP can not assure the

11

availability of FDA approved Oral fluid test reagents. Use of such reagents may require specific on-site validation, as will the testing done using the LC/MSMS. SLP will support the Company and its personnel in doing required validation.

e.  There will be a Fifteen dollar ($15.00) payment by The Company to SLP for each patient sample processed and billed using the Company's LC / MSMS systems.($10.00 per sample for the first 6 month's billing). All monthly invoices and fees are net thirty (30) days due and payable by the Company within thirty (30) days of the date of each invoice. Past due invoices will be assessed an interest charge at the rate of 1% per month.

f.  The Company will pay a deposit of Twenty five thousand dollars ($25,000) at the signing and acceptance of this Management Agreement. This payment is to cover SLP recruitment, planning, start-up, stocking and personnel costs incurred in initial set-up. Acceptance of this contract as a valid Agreement between SLP and The Company will be contingent upon, and effective as of date of the payment of the deposit.

g.  Other testing added will be subject to price negotiation by the parties.

h.  If SLP furnishes the services of its PhD Toxicology Director to guide or assist in test method development and validation, the Company will reimburse SLP salary cost of $400 per day and reasonable travel expenses For on-site envolvment.

i.  The parties agree to discuss and renegotiate this compensation schedule and plan in the event of any substantive changes in testing volumes or unexpected negative impacts of an economic nature occur. This Agreement may be terminated by either party after the first five (5) year term with one hundred eighty (180) days advance written notice.

12